**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Corrinda Spaulding, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 11 C 2926** |
| v. | ) | |
| | ) | **Magistrate Judge Nan R. Nolan** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Corrinda Spaulding (Spaulding) appeals from an ALJ's decision denying her claim for disability insurance benefits (DIB). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (doc. 7) and filed cross-filed motions for summary judgment. Because the ALJ's credibility decision is not supported by substantial evidence, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

Spaulding appeals from an ALJ's decision deny her application for disability insurance benefits under the Social Security Act. This case has a long history at the administrative level and in the federal courts. See <u>Spaulding v. Astrue</u>, 702 F.Supp.2d 983 (N.D. Ill. 2010); <u>Spaulding v. Barnhart</u>, 2007 WL 1610445 (N.D. Ill. March 2, 2007); <u>Spaulding v. Barnhart</u>, 2004 WL 1093312 (N.D. Ill. May 13, 2004); <u>Spaulding v. Halter</u>, 2001 WL 311420 (7th Cir. March 28, 2001); <u>Spaulding v. Apfel</u>, 2000 WL 1222122 (N.D. Ill. Aug. 22, 2000). The Court assumes familiarity with the underlying facts and procedural history of the case, which it references only as necessary to explain its decision.

Spaulding was born on August 3, 1966 (R. 39) and has a history of stomach-related ailments, including hiatal hernia, gastroesophageal reflux, chronic dyspepsia and erosive gastritis.

Her symptoms include abdominal cramping, chronic diarrhea, nausea, vomiting, and abdominal pain. Spaulding completed high school and previously worked as bank teller, factory inspector, payroll clerk, and factory operator/inspector. Spaulding originally applied for DIB on September 11, 1996, alleging she became totally disabled on December 16,1993 when she was 27 years old. On September 16, 2005, Spaulding was awarded supplement security income benefits as of April 27, 2004. (R. 339-47). Therefore, the only period at issue here is December 16, 1993 to April 27, 2004. Spaulding's insured status for DIB purposes expired on December 31, 1998, which means Spaulding had to show she was disabled on or before that date to be eligible for DIB.

Under the standard five-step analysis used to evaluate disability, the ALJ found that Spaulding had not engaged in substantial gainful activity since the alleged onset date of December 16, 1993 (step one); her hiatal hernia and gastrointestinal impairments in combination were severe (step two); but that they did not qualify as a listed impairment (step three). (R. 644-45). The ALJ determined that Spaulding retained the residual functional capacity (RFC) to perform a full range of light work during the period at issue, December 16, 1993 to April 27, 2004. (R. 645). Given this RFC, the ALJ concluded that Spaulding was able to perform her past relevant work as a bank teller (step four). (R. 650). The ALJ did not reach step five of the analysis and denied her application. Spaulding now seeks judicial review of the final decision of the Commissioner of Social Security, which is the ALJ's February 8, 2011 ruling. O'Conner-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010).

**DISCUSSION**

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry:

(1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). An ALJ's credibility determination should be upheld unless it is patently wrong. Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Spaulding's claim at step four, finding that Spaulding retains the residual functional capacity to perform a full range of light work. Spaulding raises one main challenge to the ALJ's decision, namely that the ALJ failed to properly analyze her credibility as required by Social Security Ruling 96-7p. The Court agrees that the ALJ's credibility determination is not supported by substantial evidence.

## A.    The ALJ's Credibility Determination

"The ALJ's credibility determinations are entitled to special deference but the ALJ is still required to 'build an accurate and logical bridge between the evidence and the result.'" Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010). ALJs are required to "carefully evaluate all evidence bearing on the severity of pain [or symptoms] and give specific reasons for discounting a claimant's testimony about it." Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011). Further, in evaluating a claimant's credibility, the ALJ must comply with Social Security Ruling 96-7p and articulate the reasons for the credibility determination. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). SSR 96-7p lists seven factors in addition to the objective medical evidence to be considered in a credibility analysis including the claimant's daily activities, the level of pain or symptoms, aggravating factors, medication, treatment, other measures to relieve pain, and limitations. SSR 96-7p, at *3. That Ruling provides that the ALJ's credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *4. The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Id.

In this case, the ALJ concluded that Spaulding's "medically determinable impairments might reasonably be expected to cause symptoms that she described but not of the severity and frequency portrayed throughout the period at issue, consistent with the detailed review of the treatment records . . . and the assessment of gastroenterologist Jilhewar, M.D., the last medical expert to testify." (R. 647). The Court considers Spaulding's various challenges to the ALJ's credibility assessment in turn below and concludes that the ALJ's credibility determination was inadequate for several reasons. The combined effect of the numerous errors by the ALJ cast doubt on the soundness of the ALJ's credibility finding.

1.      **Daily Activities**

The ALJ was required to consider Spaulding's daily activities during the period at issue as part of the credibility assessment. The ALJ did not adequately assess the effect of Spaulding's stomach-related ailments on her daily activities. This failure is particularly troubling given the Magistrate Judge's and Appeal Council's instructions to the ALJ on remand. In the remand opinion, the Magistrate Judge directed the ALJ to revisit his credibility determination "keeping in mind his obligation to look to a number of factors to determine credibility, such as . . . the claimant's daily activities . . . ." Spaulding, 702 F.Supp. at 998. In particular, Magistrate Judge Mason stated that the "ALJ should address claimant's statements regarding any limitations of her daily activities allegedly caused by her chronic diarrhea." Id. Upon remand, the Appeals Council directed the ALJ to "further evaluate the claimant's subjective complaints, particularly with regard to the issues of any limitations imposed on her daily activities by chronic diarrhea . . . and provide rationale in accordance with the disability regulations pertaining to the evaluation of symptoms" pursuant to the order of the district court. (R. 688).

In his decision, the ALJ stated that Spaulding's "childcare and other activities" were consistent with an RFC of light work. (R. 650). The ALJ did not specify what activities he meant. At the last hearing on November 22, 2010, the ALJ did not ask Spaulding about her daily activities during the time period at issue (December 16, 1993 to April 27, 2004). The ALJ explained that he did not intend to ask Spaulding "a lot of questions since we have transcripts of your testimony at all of the prior hearings." (R. 748). In his decision, however, the ALJ did not acknowledge or address Spaulding's prior testimony concerning her daily activities. At the hearing on March 3, 1998 and with regard to her activities, Spaulding testified that she had volunteered at her daughter's school a couple days a month after she stopped working in December 1993. (R. 137-38). Spaulding explained that other mothers were able to cover for her if she had to miss parent meetings or functions because of her symptoms. Id. Spaulding testified at the July 27, 2005 hearing that she

no longer volunteered at her children's schools because her diarrhea episodes made her undependable. (R. 368). Spaulding also stated, "I don't have a life." (R. 367). She testified that she has no hobbies and does not go out to the movies or out to eat because she fears having a diarrhea attack. (R. 367-38). Spaulding explained that she arranges her daily household activities around her diarrhea episodes. (R. 364-65). Her daughter also helps her with household cleaning. (R. 364). Spaulding has had diarrhea attacks when grocery shopping and has had to abandon her cart to find the closest restroom and then put away and replace cold items afterwards. Id. Because the ALJ's decision did not give proper consideration to Spaulding's testimony regarding her daily activities, he relied on an incomplete evaluation of her daily activities to determine credibility.

The ALJ also found Spaulding's statements about the frequency and severity of her symptoms less credible because of her childcare activities. (R. 650); see also (R. 649) (noting that "during the period at issue, claimant was caring for a child and from December 16, 1993 to April 27, 2004, pregnant before giving birth to her son on [September] 26, 1999."). The ALJ failed to explain why Spaulding's childcare activities made her statements concerning her need for frequent and sometimes lengthy bathroom breaks less credible. The ALJ overlooked important testimony that Spaulding gave at two prior hearings regarding her ability to care for her son, who was born on September 26, 1999. (R. 609). At the July 27, 2005 and October 30, 2007 hearings, Spaulding testified that she needed and had "a lot of help" caring for her son when he was an infant. (R. 360, 613). Spaulding stated that her daughter helped her and her son's "Godmother came and stayed with us for long periods of time." (R. 613); see also (R. 360). Spaulding also explained that when she had a diarrhea episode she would "just take [her son] and everything to the bathroom as best [she] could." (R. 360).

The ability to care for children does not equate to the ability to work full-time outside the home. Gentle v. Barnhart, 430 F.3d 865, 867-68 (7th Cir. 2005). In Gentle, the Seventh Circuit recognized that "taking care of an infant, although demanding, has a degree of flexibility that work

in the workplace does not." Id. at 867. For example, "[y]ou can park the infant in a playpen for much of the day, and anyway it will sleep much of the day, and so the caretaker will have numerous breaks in which to rest." Id. at 867-68. The Seventh Circuit has recently admonished that the failure to recognize the differences between activities of daily living and activities in a full-time job with regard to flexibility and family support "is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). It was error for the ALJ to infer an ability to work full time from Spaulding's childcare activities. See Bardgett v. Apfel, 175 F.3d 1019, at *7 (7th Cir. 1999) (noting that the "ability to function at home where one can control one's schedule and access the bathroom at will is not inconsistent with a contention that one needs six to eight bathroom breaks a day.").

Earlier in his decision, the ALJ noted Spaulding's updated testimony that she took Bible classes in 1997 and earned an A grade, despite her symptoms during the one and one-half hour classes. (R. 644, 748, 750). It is unclear whether the ALJ relied on this information in assessing Spaulding's credibility. Even if the Court were to assume that the ALJ found Spaulding's credibility regarding the severity and frequency of her symptoms undermined by her ability to take classes in 1997, the ALJ did not build a logical bridge between those activities and his conclusion that she did not need frequent and sometimes lengthy access to a bathroom. The ALJ made no mention of Spaulding's testimony that her classes were only an hour-and-a-half a couple of days a week. (R. 750). Nor did the ALJ note that there were times when Spaulding showed up late or needed to leave class early to deal with her symptoms. Id. An ALJ may consider a claimant's daily activities, including school attendance, in assessing credibility "but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence." Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011). To the extent the ALJ viewed Spaulding's class attendance as evidence of her ability to perform full-time work, the ALJ erred in failing to explain how Spaulding's ability to take "a couple of classes" in 1997 impacted her credibility.

2.     **Medication Side Effects**

As an additional challenge to the ALJ's credibility finding, Spaulding argues that the ALJ failed to explain how he considered the side effects of her medications when assessing credibility. In evaluating a claimant's credibility, the ALJ must consider, among other things, the side effects of any medication on the ability to work.  S.S.R. 96-7p.  Magistrate Judge Mason's opinion directed that on remand, "the ALJ should consider all of the claimant's medications and their side effects, including ME Jilhewar's testimony that Reglan would 'make the diarrhea worse.'" Spaulding, 702 F.Supp. at 999

The ALJ only briefly addressed the side effects from Spaulding's medications as follows: "[r]egarding the side effects of medications, consideration has been given to all of claimant's medications, including Reglan which was repeatedly prescribed throughout the time at issue on an 'as needed' basis, with the only reference to adverse side effects on February 11, 2002 being that claimant had indicated that Reglan made her sleepy."  (R. 650).  The Court's review of the record shows that on September 28, 2000, Spaulding additionally reported that "Reglan will help but also very sleepy."  (R. 504).  In any event, the Seventh Circuit is "skeptical that a claimant's failure to identify side effects undermines her credibility–after all . . . some patients may not complain because the benefits of particular drug outweigh its side effects." Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009).

The Court has trouble accepting the ALJ's statement that he considered Spaulding's medication side effects in assessing her credibility.  The ALJ's single-line summation fails to reflect to what extent he considered the Reglan side effect of drowsiness, or how he considered it.  The ALJ ignored Spaulding's testimony at the first hearing on March 3, 1998 that she tries not to take more than two Reglan pills a day because Reglan is "like a tranquilizer" to her.  (R. 144). Spaulding explained that Reglan "just wipes me out and I really don't like to take it unless the conditions are so severe and I, and I know there's no way out." Id.  At the July 27, 2005 hearing, Spaulding added

-8-

that she does not take Reglan as often as her doctor recommends because it "puts her to sleep" and she "can't be asleep all the time" because she needs to care for her five year old son. (R. 362). Spaulding further explained that one way she deals with episodes of severe symptoms is by taking Reglan because it will put her to sleep. (R. 360, 369). Medical expert Dr. Carl Leigh confirmed that Reglan causes drowsiness. (R. 380). The ALJ did not state whether he credited Spaulding's testimony about the side effects of Reglan. The ALJ may have believed Spaulding's testimony regarding Reglan's side effects to be incredible or he may have thought that the alleged symptoms were not severe enough to prevent Spaulding from performing light work. Either way, the Court cannot adequately review the ALJ's finding on this issue without some explanation of why he apparently disregarded Spaulding's testimony regarding Reglan's side effects.

There is other evidence in the record about the side effects of Reglan. Dr. Jilhewar, the medical expert who testified at the fourth hearing, stated that Reglan "make[s] diarrhea worse." (R. 630). The ALJ did not mention this Reglan side effect. This was also an error given Magistrate Judge Mason's instructions on remand regarding the assessment of Dr. Jilhewar's testimony on this issue. Spaulding, 702 F.Supp.2d at 999.

### 3. Stress

Spaulding's next argument is that the ALJ ignored the aggravating effect of stress on her gastrointestinal disorders. In assessing credibility, the ALJ must consider factors that aggravate Spaulding's condition. 20 C.F.R. § 404.1529(c); S.S.R. 96-7p Spaulding testified that stress, including the stress of full-time employment, aggravates her gastrointestinal conditions. (R. 613-15; 616-17); see also (R. 111, 143). On October 28, 1996, Dr. Colligan reported Spaulding's belief that employment-related stress caused her symptoms to become "intolerable." (R. 101). Dr. Jilhewar confirmed that stress can "definitely" increase the symptoms of irritable bowel syndrome. (R. 631). Dr. Miller similarly testified that stress can aggravate the symptoms of Spaulding's gastrointestinal conditions. (R. 324-25).

The ALJ erred in failing to address as part of his credibility analysis Spaulding's contention that employment-related stress aggravates her symptoms. Although the ALJ was not required "to provide a 'complete written evaluation of every piece of testimony and evidence,'" Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004) (quoting Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)), employment-related stress as an aggravating factor is really Spaulding's theory of the case. (R. 119, 124, 433, 602). Spaulding's allegation that employment-related stress exacerbates her gastrointestinal symptoms is also consistent with other evidence in the record, including Spaulding's work history and the improvement in her condition when not working. Between 1982 and 1993, Spaulding "held ten different jobs in the span of approximately eleven years." Spaulding, 2001 WL 311420, at *1. In 2001, the Seventh Circuit emphasized that Spaulding's case "could have gone either way" if the ALJ had, among other things, considered the cumulative effect of her symptoms, especially in light of her assertion that she had lost ten different jobs because of absences due to her illness. Id. at *5. Despite the Seventh Circuit's direction, the ALJ failed to mention, much less analyze, Spaulding's unstable job history. The improvement in Spaulding's condition noted in Dr. Colligan's July 17, 1996 treatment notes also corresponds with her theory of the case that not working had helped improve her symptoms. (R. 102 stating "[s]ince she has been off work for the past three years she has felt as well as she ever has."). Given Spaulding's theory of the case, it was especially important for the ALJ to consider and discuss her allegation of employment-related stress as an aggravating factor.

### 4.    Unscheduled Restroom Breaks

Spaulding argues that the ALJ failed to properly analyze the credibility of her claim regarding the frequency and duration of unscheduled bathroom breaks. Spaulding testified that on a good day in late 1998 she needed three to five bathroom breaks for nausea, vomiting or diarrhea. (R. 615, 618). On a bad day, Spaulding required a dozen or more bathroom breaks lasting from 10 to 30 minutes. (R. 615). Dr. Leigh, the medical expert at the July 27, 2005 hearing, testified that

Spaulding's claim that she needed extended bathroom breaks to deal with the diarrhea and nausea she was experiencing from 1993 through 1998 was not inconsistent with her impairments. (R. 379). Dr. Leigh further opined that during the 1993 to 1998 time period, Spaulding would need four to five bathroom breaks during an eight-hour workday. (R. 385-86). On the other hand, Dr. Jilhewar concluded that Spaulding could perform a full range of light work without any additional limitations. (R. 624). With regard to the issue of the frequency and duration of unscheduled restroom breaks, the ALJ gave decisive weight to testimony by Dr. Jilhewar and rejected Dr. Leigh's opinion of a need for four to five unscheduled restroom breaks during the workday. (R. 649). The ALJ noted that Dr. Jilhewar opined that "blood work of record was not consistent with the subjective complaints." (R. 649). In his decision, the ALJ stated: "Dr Jilhewar's assessment is adopted since, as already noted, he [is] a board certified gastroenterologist and Dr. Leigh is an internist; Dr. Jilhewar reviewed additional medical records not available to Dr. Leigh and over a longer period; and Dr. Jilhewar provided detailed medical justification for his conclusions." (R. 649-50).

Spaulding contends that the ALJ erred when he "failed to acknowledge the letter from claimant's attorney which calls Dr. Jilhewar's testimony regarding Ms. Spaulding's blood work into question." (Doc. 19 at 7-8). Spaulding points out that Dr. Jilhewar testified that he would expect to see lab results indicating malnutrition if Spaulding's claim regarding frequent diarrhea, nausea and vomiting was credible. (R. 620-22). Spaulding asserts that this testimony by Dr. Jilhewar conflicts with medical literature she submitted after the hearing. After the October 30, 2007 hearing, Spaulding's attorney submitted an excerpt from *Harrison's Principles of Internal Medicine* 1692 (15th ed. 2001), which states ". . . malnutrition due to inadequate caloric intake is exceedingly rare in IBS [irritable bowel syndrome]" despite symptoms. (R. 601). Spaulding asserts that the ALJ improperly ignored this evidence which supports Dr. Leigh's testimony and raises doubts about the reliability of Dr. Jilhewar's testimony.

The Commissioner argues that the ALJ was not required to give any weight to a medical textbook that contains generalized information "when he had testimony from a medical expert, a gastroenterologist, who had reviewed Plaintiff's medical records and gave an opinion regarding her particular condition and functional limitations." (Doc. 24 at 8). The Commissioner concludes that the "ALJ could reasonably find that general information from a textbook . . . that did not speak to Plaintiff's particular medical condition was not persuasive." Id

"Although ALJs need not address every piece of evidence in detail, they must address significant evidence and explain why strong evidence favorable to the claimant is overcome by the other evidence." Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 678 (7th Cir. Jan. 26, 2010); Diaz, 55 F.3d at 308 (holding "[a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of evidence to allow the appellate court to race the path of his reasoning."). The ALJ relied on Dr. Jilhewar's statements that Spaulding's gastrointestinal impairments do not cause the severity of symptoms that Spaulding alleged without lab work evidencing malnutrition. Because the ALJ did not address the medical literature cited by Spaulding's counsel, it is not clear whether he considered it or how he weighed it. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004) (requiring the ALJ to "confront the evidence that does not support his conclusion and explain why it was rejected."). The ALJ erred by not addressing the medical literature submitted by Spaulding's counsel. Nevels v. Astrue, 2011 WL 1362613, at *8 (N.D. Ill. April 7, 2011) (finding remand necessary where ALJ failed to discuss medical literature submitted by claimant's counsel which contradicted medical expert's statements). This error cannot be found harmless because the vocational expert at the 2005 hearing testified that generally employers do not allow four to five extra breaks throughout the workday. (R. 386-87); see also (R. 752-55). The Commissioner's argument that the ALJ could reasonably reject general information from a medical textbook in favor of testimony regarding Spaulding' particular condition is unavailing because that the ALJ did not discuss–much less explain his apparent rejection of–the

favorable medical literature cited by Spaulding's counsel.

### 5.    Gaps in Treatment History

The ALJ also discounted Spaulding's credibility because there were gaps in her treatment. (R. 648).  An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ."  Social Security Ruling 96-7 p.  But an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment."  Id; Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008) (emphasizing that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.").  An ALJ may need to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not purse treatment in a consistent manner."  Id.  Explanations which may provide insight into the individual's credibility include not seeing a doctor because the individual is "unable to afford treatment and may not have access to free or low-cost medical services."  Id.

The ALJ opined that there were "significant gaps in [Spaulding's] history of treatment."  (R. 648).  The ALJ noted that "on June 4, 1996 Dr. Loftin . . . indicated that no medications could be ordered since the claimant had not been seen since May 16, 1995.  Dr. Colligan reported on October 28, 1996 that the claimant had not been examined since April 28, 1992."  Id.  The ALJ inaccurately suggests that Spaulding did not seek treatment between April 28, 1992 and May 16, 1995.  In fact, Dr. Loftin treated Spaulding in July 1993, August 1993, October 1993, and December 1993.  (R. 85-89).  Spaulding also received treatment from Dr. Loftin in May 1995 and June 1995. (R. 83, 84).  Dr. Colligan resumed treatment of Spaulding in July 1996.  (R. 102).

The ALJ here did not follow the guidelines established in SSR 96-7p. There are gaps in Spaulding's pursuit of treatment between December 16, 1993 to May 15, 1995 and June 15, 1995 to July 16, 1996, but the problem here is that the ALJ did not question Spaulding about possible reasons for her lack of treatment during these time periods and he did not discuss any possible reasons for the gaps in his decision. The record contains a possible reason for the lack of medical care, namely an inability to afford treatment. The ALJ failed to address Spaulding's explanation that gaps in treatment stemmed from her lack of health insurance and inability to afford care. In June 1996, Spaulding contacted Dr. Loftin to request a medication refill. (R. 82, 84). When Spaulding was told she needed to make an office visit, she responded that she "could not afford an office visit" because neither she nor her husband was working. (R. 84). The record contains other information about Spaulding's inability to afford treatment. On July 17, 1996, Dr. Colligan noted that Spaulding "stopped seeing us in 1992 because she owed some money. She has been seeing Dr. Loftin because her husband's employment HMO used him as their primary care physician." (R. 102; 133-34). In her testimony, Spaulding clarified that the HMO was through her employment with the bank, which ended in December 1993, and thereafter, she has been unemployed and not covered under any policy of her husband's. (R. 149-52). Spaulding became covered under Medicaid in 1999. (R. 372). At the March 3, 1998 hearing, Spaulding added that Dr. Colligan sometimes gave her samples of medications and approved her last prescription refill without an office because of her inability to pay. (R. 130). In making his credibility determination, the ALJ never noted Spaulding's explanations. Without doing so, the ALJ was not entitled to infer that her failure to seek treatment shows that her symptoms were less serious than she described.

### 6. Bending Limitation

Spaulding's remaining argument is not persuasive. Spaulding argues that the ALJ failed to properly analyze the credibility of her claim regarding a limitation in bending. On October 28, 1996, Dr. Colligan, a gastroenterologist and one of Spaulding's treating physicians, opined that Spaulding

"should not bend over." (R. 101). Spaulding testified that when she bends over, she "gets even more bowel backup into [her] esophagus." (R. 363); see also (R. 143, 148). The ALJ noted that Dr. Jilhewar's RFC assessment, which included no bending limitation, differed from Dr. Colligan's opinion on this issue. (R. 649). The ALJ stated that he gave more weight to Dr. Jilhewar's opinion and concluded that Spaulding has no limitation in bending. Id.

The ALJ's finding that Spaulding was not credible with regard to her claim of a bending restriction is supported by substantial evidence. First, the ALJ properly considered the lack of objective medical evidence supporting Spaulding's alleged bending limitation. (R. 649). In addition to relying on the lack of supporting objective medical evidence regarding a bending limitation, the ALJ noted that Dr. Colligan's bending limitation appeared to be based on Spaulding's subjective complaints. Id. An ALJ may discount a treating physician's opinion if it is based solely on the patient's subjective complaints. Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008); Rice, 384 F.3d at 371 (noting the ALJ may properly reject a doctor's opinion if it is based on subjective allegations rather than objective observations.). The ALJ also properly assigned greater weight to Dr. Jilhewar's finding of no bending limitation because it was more consistent with the record as a whole. When considering whether to accept a medical opinion, the ALJ must consider the extent to which the doctor's opinion is supported by medical signs and laboratory findings and the extent to which the source's opinion is consistent with the record as a whole. 20 C.F.R. 404.1527(d) (stating "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the Commissioner] will give to that opinion."). As the ALJ noted, Dr. Miller, the ME at the second hearing, stated that there was no diagnosis in the record to substantiate a bending limitation. (R. 316). The ME at the third hearing, Dr. Leigh, opined that a reasonable limitation would be a restriction to occasional bending. (R. 378). However, as the ALJ pointed out, the vocational expert confirmed that Spaulding could perform her past relevant work as a bank teller if limited to occasional bending. (R. 754; 378).

-15-

Spaulding contends that the ALJ erred in relying on Dr. Jilhewar's opinion to reject Dr. Colligan's opinion that Spaulding could not bend because Dr. Jilhewar did not offer an opinion regarding Spaulding's ability to bend. In his 2010 opinion, Magistrate Judge Mason stated that ME Jilhewar "did not make any explicit findings regarding claimant's ability to bend. Rather, he testified that claimant would be restricted to light work and 'should be able to stand six hours in an eight-hour work day' and sit 'indefinite,' and had 'no manipulative limitations.'" Spaulding, 702 F.Supp.2d at 998. The undersigned respectfully agrees with the Commissioner that by concluding Spaulding "would be restricted to light work with no additional restrictions," it is reasonable to conclude that Dr. Jilhewar considered and rejected any other possible limitations, including a bending restriction. (R. 624). Nonetheless, Magistrate Judge Mason also held that "[h]ad the ALJ expressly found that Dr. Colligan's opinion was based on claimant's own statement, or that it is entitled to little weight due to an abundance of conflicting evidence, we would be inclined to credit that determination." Spaulding, 702 F.Supp.2d at 999. Because the ALJ articulated both of these valid reasons for rejecting Dr. Colligan's opinion regarding a bending restriction, the ALJ did not err.

**B.    Appropriate Remedy**

Spaulding asks the Court to direct an award of disability insurance benefits for the period at issue rather than remanding the case to the Social Security Administration (SSA) for further proceedings. Spaulding says that the SSA "has had many chances to make a proper decision in Ms. Spaulding's case and has continually failed to do so – she has been pursuing this case since 1996 and now had multiple appeals and five administrative law judge hearings and decision." (Doc. 19 at 12). The Commissioner argues that a remand is the appropriate remedy if the Court finds that the ALJ's decision was not supported by substantial evidence.

A judicial award of benefits is appropriate "only if all factual issues have been resolved and the record supports a finding of disability." Allord v. Astrue, 631 F.3d 411, 417 (7th Cir. 2011). This standard is not met in this case. Spaulding relies on District Judge Moran's statement in his 2007

remand opinion that "[t]he ALJ's failure to provide a full and fair credibility determination and assessment of the entire record will lead to the grant of plaintiff's benefits." Spaulding, 2007 WL 1610445, at *7. As Magistrate Judge Mason recognized, however, the ALJ's repeated failure to make a proper credibility determination coupled with the longstanding nature of this case does not allow for an award of benefits. Spaulding, 702 F.Supp.2d at 996; see also Allord, 631 F.3d at 417 (noting that "[o]bduracy is not a ground on which to award benefits; the evidence properly in the record must demonstrate disability."). Because the record in this case allows for conflicting conclusions regarding disability during the period at issue, the appropriate remedy is a remand for further consideration. Spaulding, 702 F.Supp.2d at 996.

## CONCLUSION

It is with extreme reluctance that this Court prolongs this litigation further. Spaulding's application for disability insurance benefits was filed on October 9, 1996. It is now almost 16 years later. On remand, the Court "expects, promptness and an attention to detail lacking in previous iterations [in determining] whether the available evidence indicates and award of benefits is appropriate" for Spaulding. Allord, 631 F.3d at 418.

For the reasons stated above, Plaintiff's Motion for Summary Judgment [19] is granted, and the Commissioner's Cross-Motion for Summary Judgment [23] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Corrinda Spaulding and against the Commissioner of Social Security.

**E N T E R :**

_Nan R. Nolan_

---

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: August 13, 2012**